**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

DEBRA LITTLEFIELD,

        *Plaintiff*,

*v.*

COMMISSIONER OF
SOCIAL SECURITY,

        *Defendant.*

_____/

CASE NO. 2:18-12191

DISTRICT JUDGE DENISE PAGE HOOD

MAGISTRATE JUDGE PATRICIA T. MORRIS

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**
(R. 9, 11)

## I.  RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment, (R. 9), be **DENIED**, the Commissioner's Motion for Summary Judgment, (R. 11), be **GRANTED**, and this case be **AFFIRMED**.

## II.  REPORT

### A.  Introduction and Procedural History

This is an action for judicial review of a final decision by the Commissioner of Social Security denying Plaintiff Debra Littlefield's claim for Disability Insurance Benefits (DIB) under Title II, 42 U.S.C. § 401 *et seq.* (R. 1). Pursuant to 28 U.S.C. § 636(b)(1)(B),

1

E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned Magistrate Judge. (R. 3). Currently before the court are Plaintiff's and Defendant's cross-motions for summary judgment (R. 9, 11). Plaintiff has also filed a response to Defendant's motion. (R. 12).

Plaintiff filed her application for DIB on August 19, 2015,[1] alleging onset on July 20, 2015. (R. 10 at PageID.165-71). Her claim was denied at the initial level on December 22, 2015. (*Id.* at PageID.99). After an administrative hearing was held at Plaintiff's request, (*id.* at PageID.61-87), Administrative Law Judge (ALJ) Melissa M. Santiago issued a decision finding that Plaintiff had not been under a disability from her alleged onset date through the date of the decision, December 27, 2017. (*Id.* at PageID.46-60). The Appeals Council denied Plaintiff's request for review. (*Id.* at PageID.35-40). This action followed. (R. 1).

### B.  Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a

---

[1] The ALJ stated that Plaintiff filed her application on August 12, 2015. (R. 7 at PageID.49). Neither party has expressed any concern about this discrepancy, and I cannot see how it would affect the outcome, as the ALJ found that Plaintiff was not under a disability between her alleged onset date, July 20, 2015, and the date of the decision, December 27, 2017. (*Id.* at PageID.57).

preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.*

### C. Framework for Disability Determinations

Under the Social Security Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).   The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. . . .

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered him or her unable to engage in substantial gainful activity. 42

U.S.C. § 423(d)(1)(A). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ found Plaintiff had not been under a disability from the alleged onset date of July 20, 2015, through the date of the decision, December 27, 2017. (R. 7 at PageID.49-57). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the relevant period. (*Id.* at PageID.51). Next, the ALJ determined Plaintiff had the following severe impairments: generalized anxiety disorder, cognitive impairment, and adjustment disorder. (*Id.*). In addition, Plaintiff had the non-severe impairments of hypertension, lupus, right knee arthropathy, and tremor. (*Id.* at PageID.51-52). She did not, however, have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. (*Id.* at PageID.52-53).

Before proceeding further, the ALJ found Plaintiff had the RFC to perform a full range of work at all exertional levels but with the non-exertional limitation of only simple and routine instructions and tasks. (*Id.* at PageID.53-56). At steps four and five, the ALJ concluded that Plaintiff was unable to perform her past relevant work, but that jobs she

5

could perform existed in significant numbers in the national economy—for example, Hospital Food Service Worker (100,000 jobs nationally); Dining Room Attendant (200,000 jobs nationally); and Kitchen Helper (210,000 jobs nationally). (*Id.* at PageID.56-57). Thus, the ALJ determined that Plaintiff had not been under a disability as defined in the Social Security Act during the relevant time. (*Id.* at PageID.57).

### E. Administrative Record

#### 1. Medical Evidence

On February 13, 2015, Plaintiff attended a meeting with human resources at the hospital where she worked as a surgical technician. (R. 7 at PageID.256). Two days earlier, Plaintiff had been taken "off call" after two incidents: first, Plaintiff had struggled to fasten safety straps, even with a coworker's help; second, Plaintiff had had to ask a coworker how to get to the obstetrics unit of the hospital so she could help with a C-section. (*Id.*); *see* (*id.* at PageID.270). In response, Plaintiff explained that she was not the only person to have problems with the straps, and that she knew how to get to obstetrics but had thought she was supposed to go a different way due to a change in protocol. (*Id.* at PageID.256). Further, she had assisted with only a few C-sections. (*Id.*). Plaintiff was upset and felt the concerns were "petty and insignificant." (*Id.*).

At a March 9, 2015 fitness-for-duty assessment by Dr. Uma Savanoor, Plaintiff said there had been no change in her job duties and denied any forgetfulness or issues with coworkers or surgeons. (*Id.* at PageID.264). Plaintiff had been at the same hospital for the past six years, where she had assisted in a variety of surgeries. (*Id.*). Her medical history included hypothyroidism and depression. (*Id.*). She also reported feeling jumpy and shaky

6

and having palpitations in the morning until she ate, which had worsened since her hypothyroidism medication was changed. (*Id.*).

Another appointment with Dr. Savanoor regarding Plaintiff's fitness for duty is dated two days later. (*Id.* at PageID.254). At that time, Plaintiff said she was stressed because of the concerns about workplace safety that HR had shared with her. (*Id.* at PageID.254). As her husband was retired, she "really has to have a job because she is the sole insurance carrier." (*Id.*). She had had discoid lupus for 10 years, "controlled by lifestyle changes"; she had had some hair loss over the past two years but found that changing shampoo and make-up had stopped its progression. (*Id.*). She was being referred to a rheumatologist for knee pain, but said the pain did not bother her at work and denied any other joint pain. (*Id.*). Dr. Savanoor had observed a mild head tremor but normal joint examinations and normal coordination. (*Id.*). Plaintiff also requested a psychological evaluation "in regard to her anxiety and past history of depression and also forgetfulness and confusion reports." (*Id.*).

Later that month, Plaintiff went to a follow-up with Dr. Savanoor about her fitness-for-duty evaluation. (*Id.* at PageID.248). She planned to make an appointment with a rheumatologist, as recommended. (*Id.*). She said she had been working without any problems. (*Id.*). Dr. Batra had recently stopped her thyroid medications, which had resolved her feelings of anxiety in the mornings, but she now felt "in the dump[s]," and planned to follow up with Dr. Batra. (*Id.*). Plaintiff was "to continue with the same work duties at this time without any change." (*Id.* at PageID.261).

7

At an evaluation for lupus on April 9, 2015, Plaintiff reported she had had discoid lupus for 11 years. (*Id.* at PageID.247). To control it, she tried yoga, walking, juicing, PreserVision vitamins, vitamin E, and vitamin D. (*Id.*). Discoid lesions on her face and scalp had cleared up with steroid creams recommended by her dermatologist. (*Id.*). She had had mild recurrences, with the last more than a year ago. (*Id.*). In addition, she had some hair thinning and erythema around her ears, and "some dry mouth/dry eyes" while working in prolonged surgeries. (*Id.*). At the time, she reported no joint pain except intermittent aches in her knees at the end of a workday. (*Id.*). At an appointment the same day with rheumatologist Dr. Sheryl Mascarenhas, Plaintiff received a prescription to combat her hair loss and additional testing was ordered for any signs of systemic lupus. (*Id.* at PageID.259). She was to follow up in six months. (*Id.*).

A June 15, 2015 letter to Dr. Savanoor from clinical psychologist Linda Endres— just over one month prior to onset—reported the results of Plaintiff's fitness-for-duty evaluation. (*Id.* at PageID.251). Plaintiff arrived on time, well-groomed and neatly dressed, and was polite and responsive to questions, although she appeared nervous. (*Id.*). Her speech was coherent and well-organized, her eye contact was good, and she was fully oriented to person, place, and time. (*Id.*). She expressed frustration about having to go through the evaluation process and letting her coworkers down by not being on call. (*Id.*).

Plaintiff had worked in the surgical technology field for the past 16 or 17 years, and at Bixby Hospital assisting in surgeries for the past 6. (*Id.* at PageID.251, 257). Plaintiff reiterated that she had been diagnosed with discoid lupus 10 years ago, which she controlled "with lifestyle changes and vitamins." (*Id.* at PageID.257). She had seen a

rheumotologist for hair loss and knee pain, and denied other joint pain. (*Id.*). Although she had been diagnosed with depression several years ago and prescribed medication, she had "quickly discontinued" the prescription because she "did not like it." (*Id.*).

Enderes reviewed seven notes[2] submitted by coworkers and surgeons, all of which expressed concerns about Plaintiff's competence, forgetfulness, and lack of organizational skills. (*Id.* at PageID.273). She also considered a performance review presented by Plaintiff

---

[2] These comprise four handwritten notes and three emails, all anonymous. The first note states: "She is increasingly forgetful, has trouble keeping up during surgery let alone anticipating. Has pulled wrong instruments and handed wrong instrument during the case." (*Id.* at PageID.250). The second note lists, in bullet-point form, "lack of memory, confusion, surgeon frustration, doesn't anticipate for routine, pulling cases properly, follow need by other staff, lack of ability to think ahead, clueless, staff comments on memory." (*Id.* at PageID.255). The third, also in bullet points, says, "Forgetful, clueless, can't follow cases, simple cases—forgetful, doesn't anticipate, does okay thru part of case then draws a blank." (*Id.*). The fourth note remarks that Plaintiff has "[r]eliable OR etiquette" and "can follow" in minor cases in the operating room, but "requires some homework" and "fine-tun[ing]" of skills in major cases. (*Id.* at PageID.271).

Three unsigned emails from February 2015 express similar concerns. One reads: "I try protecting Debi a little bit by putting her in the easiest room or having her be the second scrub on cases. If I put her in a difficult case, the surgeons often come to me complaining that she lacks organizational skills and acts as if it was the first time she has ever done that type of case. On the other hand, she does come to me with questions about cases for the next day making sure that we have the necessary equipment for the case." (*Id.* at PageID.265).

Another unsigned email states that Plaintiff was "a very nice and pleasant person to work with" who was "willing to stay extra when needed." (*Id.* at PageID.267). It expressed concerns, however, with her competency and memory: "[E]ven with routine cases . . . she is not meeting the standard that the other techs are able to meet. She does not remember the order with which we do things or the basic equipment that needs to be ready . . . ." (*Id.*). Other techs needed to review her work, creating extra work for her coworkers and sometimes extra expenses for the hospital. (*Id.*). The writer had observed that in the operating room, "she moves very slowly and deliberately as if she doesn't have the confidence or the knowledge to assist," making it "challenging for the surgeon to work efficiently." (*Id.*).

The third email, apparently from a surgeon, expressed that "there have been problems with her performance as a scrub nurse ever since she arrived at Bixby Hospital." (*Id.* at PageID.268). The writer said that while Plaintiff "is a very nice person[,] . . . I think her talents lie in areas other than the surgical field." (*Id.*). The writer recounted several examples of Plaintiff making errors during surgery, such as drawing up the wrong solution when a surgeon requested a local anesthetic. (*Id.*). Further, the writer had noticed Plaintiff had "a very significant tremor which makes it near impossible for her to directly assist the surgeon if she has to grasp the tissue with a forceps or other instrument." (*Id.*).

that covered the time during which the complaints were made, and on which she had scored 85.49 out of a possible 90. (*Id.* at PageID.274).

On testing, Plaintiff demonstrated "a severe deficit in visual-motor integration and below average range weakness in visual-spatial reasoning." (*Id.* at PageID.274). Her visual-spatial memory was "overall an average range relative weakness, but her memory specifically for shapes and their locations is below average." (*Id.* at PageID.274, 252). She demonstrated strong rote verbal memory, and average verbal intelligence. (*Id.* at PageID.273).

Endres explained that "[v]isual-motor integration is the coordination of fine motor hand movements with what someone sees." (*Id.* at PageID.252). For example, in Plaintiff's work as a surgical technician, she would rely on visual-motor integration to draw up medication in a syringe or grasp tissue with an instrument. (*Id.*). Endres found Plaintiff's visual-motor integration skills comparable "to an average 7-year, 1-month-old child." (*Id.*).

Visual-spatial reasoning, meanwhile, was used for tasks like solving puzzles, finding patterns, and reading maps, like finding one's way through a building, tying safety straps, or organizing a workspace. (*Id.*). Her skills in that area were weaker than 86% of adults in her age range. (*Id.*).

And visual-spatial memory was used to "remember where things are in space . . . but is also needed to remember a timeline of events, the order of a procedure, [or] the shape of an instrument." (*Id.*). A person with weak visual-spatial memory "can be repeatedly faced with routine tasks without remembering how to do them." (*Id.*). Plaintiff demonstrated "design memory skills" weaker than 84% of adults in her age range. (*Id.*).

Endres formulated several opinions and recommendations based on her evaluation. (*Id.* at PageID.258). In Endres's opinion, Plaintiff was not fit for duty in her current position. (*Id.*). Endres elaborated: "Her severe deficiency in visual-motor integration greatly increases the risk of errors in fine motor movements. As a result, Ms. Littlefield poses a patient safety risk when performing job duties that involve fine movements with her hands, such as grasping tissue in surgery and handing sharp instruments to others." (*Id.*). She also had "a significant weakness" in visual-spatial reasoning, and "would not perform well with job duties that require tasks such as reading maps, orienting herself in space, solving visual puzzles, putting objects together, and setting up objects in spatial fields." (*Id.*). She suggested that Plaintiff "may personally want to pursue other job opportunities that do not require fine motor skills and are not based in visual-spatial skills," but instead capitalized on her strengths—her verbal memory, pleasant nature, willingness to work late, and good etiquette. (*Id.*). Endres also recommended Plaintiff undergo more in-depth neuropsychological evaluation "to better understand her pattern of strength and weaknesses," and a medical follow-up with a neurologist "given what appears to be a focal decline in cognitive functioning that . . . is likely due to lupus." (*Id.*).

On July 17, 2015, Dr. Savanoor penned a letter to the Administrative Director of Human Resources for ProMedica Regional Acute Hospitals: "In my medical opinion as per the fitness for duty evaluation of Debbie Littlefield taking into consideration the reports of close observation by various coworkers at Bixby, medical history and the evaluation by Dr. Linda Endres, Clinical Psychologist, there are significant safety concerns in regards to performing essential job duties." (*Id.* at PageID.316). After summarizing Endres's

11

findings, she recommended that, "in view of patient safety," Plaintiff "be removed from patient care duties or any other safety sensitive duties." (*Id.* at PageID.316-17).

Plaintiff's alleged date of onset fell three days later, on July 20, 2015, and she applied for benefits in August 2015. (*Id.* at PageID.49). On December 11, 2015, state agency consultant Dr. Shahida Mohiuddin determined Plaintiff had no severe physical impairments, and would be able to "understand, remember, and follow simple instructions, make simple decisions, adapt, relate & do simple, routine work." (R. 7 at PageID.89-93). On December 22, 2015, state agency consultant Fred Greaves found that Plaintiff had several severe impairments—Affective Disorders, Anxiety Disorders, and Organic Mental Disorders—and two non-severe impairments, Systemic Lupus Erythematosus and Essential Hypertension. (*Id.* at PageID.93). Greaves opined that Plaintiff had mild restrictions of activities of daily living and in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation. (*Id.* at PageID.94). Thereafter, Plaintiff was found not disabled at the initial level. (*Id.* at PageID.80-99).

In February 2016, Plaintiff explained in a disability report for her appeal, "I experience joint pain and other associated symptoms when I become ill [due to lupus] and the immune system kicks in and my joint pain is severe. [T]he severe state can last 2 to 3 weeks before it settles." (*Id.* at PageID.219). And things had worsened: "Some days its hard to button or tie shoes, shave my legs, tremors, tweeze eyebrows tremors, sleep I usually sleep with a pillow between my knees they are painful. I cannot play bells at church, cannot sew or knit anymore(tremors), cannot mow, cook. I need to check recipes over and

over, cannot keyboard well (tremors), it hurts to climb our stairs, only do light housekeeping, dusting, my husband sweeps and mops." (*Id.* at PageID.218) (sic throughout).

Plaintiff saw Dr. Narinder Batra about half a dozen times from November 2014 through summer 2015. He prescribed her medication for her hypothyroidism, (*id.* at PageID.311), and discussed her gastroesophageal reflux disease, (*id.* at PageID.312), and discoid lupus with her, (*id.* at PageID.306, 311, 313). He also noted elevated blood pressure, which Plaintiff was instructed to track at home, (*id.* at PageID.304, 306, 309), and on one occasion palpitations, (*id.* at PageID.309). He ordered lab work based on her complaints of joint pain in November 2014. (*Id.* at PageID.313).

On November 23, 2015, Dr. R. Scott Lazzara, evaluated Plaintiff at Michigan Medical Consultants. (*Id.* at PageID.347). Plaintiff complained of significant deficiency in spatial reasoning, a deficit in visual motor integration, lupus, and arthropathy in her knees and elbow. (*Id.*). She was not undergoing any active treatment for her lupus or any physical therapy; she tried to go for walks and meditate, do yoga, and change her diet. (*Id.*).

Plaintiff told Dr. Lazzara that she was able to drive, do household chores, and shop for groceries, and that she enjoyed volunteering at church, doing book clubs, gardening, and reading. (*Id.*). She had recently quit knitting, however, due to her difficulty with manipulative tasks. (*Id.*). Dr. Lazzara found her grip strength intact and dexterity unimpaired, and observed that "she complains of difficulty with manipulative tasks but is able to do manipulative tasks today," including picking up a coin and buttoning clothing. (*Id.* at PageID.348-51). Her gross motor function appeared stable. (*Id.* at PageID.351). On

physical examination, she evinced no joint laxity, crepitance, or effusion. (*Id.* at PageID.348). She had normal range of motion in her cervical spine, dorsolumbar spine, shoulders, elbows, hips, knees, ankles, wrists, hands, and fingers. (*Id.* at PageID.349-50).

Dr. Lazzara concluded that "[f]rom an orthopedic standpoint it [systemic lupus erythmatosis] appears to be relatively quiescent." (*Id.* at PageID.351). He opined that most of Plaintiff's "symptomology appears to be a possible vasculopathy which she sustained an infarction [sic] to the thalamus or mid brain which would be very subtle." (*Id.*). He suggested occupational therapy "and activity as tolerated," as well as anti-platelet agents such as baby aspirin. (*Id.*). Imaging of Plaintiff's knees done the same day showed no acute traumatic or intrinsic osseous abnormalities; well-maintained joint spaces without marginal spurring, eburnation, or erosive change; and no effusion or loose body on either side. (*Id.* at PageID.346).

On December 11, 2015, Plaintiff attended an evaluation with psychologist Gayle Oliver-Brannon. (*Id.* at PageID.356). Plaintiff explained that because of her lupus, she had "[s]ome mild mental slowing and confusion," would "forget how to do things," and found it "[h]ard to grasp and handing [sic] refined sharp medical instruments." (*Id.* at PageID.353). "As a result she has been recommended not to engage in work tasks that require specialist fine motor tasks." (*Id.*). She also had knee pain, and reported that she felt "hopeless and helpless over her condition," with sadness, crying spells, anxiety, and worrying over the loss of her job and insurance. (*Id.*). At the time, her medications were Levothyroxine and Ventolin (as needed). (*Id.*).

14

Plaintiff told the psychologist that she enjoyed baking and gardening, and could care for her hygiene, get dressed, and have breakfast on a daily basis. (*Id.* at PageID.353). She did household chores, cooking, and shopping with her husband. (*Id.*). She attended church regularly and spent evenings with family. (*Id.*). She had driven to the appointment. (*Id.* at PageID.354). Her attitude was moderate, her judgment and insight were intact (although she second-guessed herself "a lot"), her mood was "low," her affect was tenuous, and her thought process was not goal-oriented. (*Id.*). Her speech was clear, logical, and spontaneous. (*Id.*).

In the end, the psychologist diagnosed Plaintiff with (1) adjustment disorder with mixed anxiety and depressed mood; (2) generalized anxiety disorder; and (3) mild neurocognitive disorder due to lupus. (*Id.* at PageID.355). By way of explanation, she noted Plaintiff seemed socially appropriate and motivated to improve her condition to function as normally as possible, and was "able to understand and engage in some moderate daily living tasks noting decline in fine motor and some cognitive function." (*Id.*). The psychologist recognized that "[c]omplex tasks may be difficult for her," and opined that "if employment is considered some restrictions may be needed." (*Id.*). She expected that Plaintiff would be able to manage benefit funds. (*Id.*).

On March 15, 2016, clinical/forensic neuropsychologist Timothy F. Wynkoop completed a neuropsychological evaluation of Plaintiff. (*Id.* at PageID.362). Wynkoop recognized that prior psychological testing suggested visuospatial disturbance and a recent brain MRI revealed diffuse cerebral white matter change "suggestive of mild chronic microangiopathy." (*Id.*). Plaintiff presented with good hygiene, grooming, and dress, and

was friendly and cooperative. (*Id.* at PageID.363). Her speech was fluent, coherent, and normal in rate, rhythm, and volume, though she "tended to answer questions circumspectly and even tangentially." (*Id.*). Recently, she had been feeling "angry and down over her situation." (*Id.*).

Plaintiff told Wynkoop that she volunteered in student ministry, hospice, and schools; drove "without incident"; and enjoyed cooking, gardening, and spending time with her family. (*Id.*). She now had difficulty playing bells and knitting, however. (*Id.*).

On sensory-perceptual/motor testing, Plaintiff showed normal grip strength but slow fine manual speed/dexterity, in the low-average range. (*Id.* at PageID.364). Wynkoop did not observe tremor "aside from one [point] when she appeared to tense the muscles in her neck and upper torso causing her to shake." (*Id.*). She tested with average general psychometric intelligence, without evidence for attenuation. (*Id.*). Wynkoop found she had "[d]efective sustained attention"—she was able to repeat digits forward and backward "superiorly," but "demonstrated substantial difficulty with sustained attention on a visual continuous performance test." (*Id.* at PageID.365). As for visual processing speed, Wynkoop found her "[c]apable of" performing within normal limits, as "[s]he struggled on a timed test requiring visual scanning, numeric processing, and psychomotor output . . . but it was clear that she was capable of doing better given her average performance on a more difficult alphanumeric dialogue." (*Id.*). A test of her learning and recall abilities resulted in "[u]nexplained variability suggesting WNL [within normal limits] capacities." (*Id.*). On a visuoperception test, she displayed constructional dyspraxia, but performed within normal limits on tests of spatial orientation. (*Id.* at PageID.366). Her basic language functions were

within normal limits. (*Id.*).  In the executive realm, she showed "[p]roblematic organization and planning, and concept formation and maintaining the problem solving set (difficulty directing and sustaining her cognitive resources)." (*Id.*). Testing of her mood evinced mild dysphoria and a tendency for stress to exacerbate physical or cognitive symptoms. (*Id.* at PageID.367). Based on Plaintiff's descriptions, she was within normal limits as far as her activities of daily living and affairs; she "struggles with daily pain but had difficulty describing its origin and range." (*Id.*).

Wynkoop summarized his examination results: "In the context of likely average native intelligence and defective sustained attention, Mrs. Littlefield demonstrates variable attention and effort (probably an executive dysfunction) resulting in variable recall and recognition; constructional dyspraxia (with WNL spatial orientation), difficulty with organization and planning, and problematic concept formation and maintaining the problem solving set (i.e., difficulty directing and sustaining her cognitive resources which is an executive dysfunction)." (*Id.* at PageID.367). He had not observed the upper-extremity tremor she reported, but had found slow fine manual speed/dexterity on a standardized test. (*Id.*). These findings, he explained, "implicate disrupted subcortical-fontal functions related to cerebrovascular changes and lupus, possibly compounded by hypothyroidism (which can affect memory and mood)." (*Id.* at PageID.367-68). His diagnostic impressions included mild cognitive impairment and mild reactive dysphoria. (*Id.* at PageID.368).

Wynkoop suggested a neurology consultation, continued treatment for her hypothyroidism, and increased activity for her reactive dysphoria. (*Id.*). His data "suggests

that she should not be driving." (*Id.*). He also expressed that he was "glad that Mrs. Littlefield is no longer involved in direct patient care as today's test results suggest that she may have difficulty in this regard. However, I cannot speak to how she may function once toxic/metabolic issues are addressed." (*Id.*).

On March 4, 2016, Plaintiff established care at Jacob Martinez Family Practice and requested referrals for dermatology, rheumatology, and neurology. (*Id.* at PageID.413). She reported tremors that "come and go," joint pain, and fine motor and coordination deficits that prevented her from continuing her work in surgery. (*Id.*). She had been anxious and stressed. (*Id.*). On physical examination, her balance was impaired. (*Id.* at PageID.416). She was referred to various specialists and for a brain MRI. (*Id.* at PageID.416-17); *see* (*id.* at PageID.424) (page one of two of brain MRI; whereabouts of second page are unknown). Later that same month, Plaintiff returned for a followup. (*Id.* at PageID.409). She expressed concerns about joint pain and balance problems, and explained that "she has difficulty trusting that the imagery she perceives represents the actual spatial orientation of objects in her environment," which caused her "a great deal of apprehension with respect to engag[ing] in her activities of daily living." (*Id.*). She had fallen off her bike the previous summer. (*Id.*). She denied depression but was down and afraid of being unable to drive or care for her husband, who suffered from macular degeneration. (*Id.*). Imaging was ordered for her joint pain. (*Id.* at PageID.413).

Several months later, in May 2016, Plaintiff went to the dermatologist for discoid lupus facial lesions and scaling in her ears. (*Id.* at PageID.385). The dermatologist also noted scarring alopecia on her scalp and actinic damage on her face, neck, and extremities.

(*Id.* at PageID.394). For the latter, the dermatologist suggested sun protection and applying sunscreen. (*Id.* at PageID.395). For her facial lesions and the scaling in her ears, Plaintiff received two prescriptions; the dermatologist also mentioned cosmetic laser treatment was an option. (*Id.*).

In August 2016, Plaintiff went to Jacob Martinez Family Practice because about a month prior she had noticed a large bruise on her right arm and left leg, as well as scattered bruises on her right leg, that she did not know how she had gotten. (*Id.* at PageID.405). Labwork was ordered. (*Id.* at PageID.408). Her affect and mood were normal, and she denied feeling down, depressed, or hopeless over the past two weeks. (*Id.* at PageID.405, 407).

Almost a year later, on June 21, 2017, Plaintiff saw Mary B. Darling, Nurse Practitioner (NP), for concerns about headaches that occurred about 3 times a month, lasting 45 minutes to 2 hours, associated with photophobia, nausea, and fatigue. (*Id.* at PageID.435). Excedrin helped "some," and the headaches resolved with rest. (*Id.*). The NP ordered labs and gave her a prescription for migraines. (*Id.* at PageID.436).

Finally, x-rays from July 12, 2017 showed mild degenerative changes in her right knee, and negative results in her left knee. (*Id.* at PageID.426, 430).

### 2.  Application Reports and Administrative Hearing

### i.  Plaintiff's Function Report

Plaintiff completed a function report on August 31, 2015. (R. 7 at PageID.202-10). She explained that she had been diagnosed with lupus 10 years ago, as well as visual-spatial deficiencies—a "domain of cognitive dysfunction that can develop with lupus." (*Id.* at

PageID.202). She reported some of the results from Wynkoop's testing, which I explored in detail above. (*Id.*).

On an average day, Plaintiff would "keep up my household with the help of my husband," help with yardwork, go for a walk, and garden. (*Id.* at PageID.204). With help from her husband, she cleaned her house once a week, did the laundry, and gardened "almost daily." (*Id.* at PageID.205). She went outside every day, either walking, driving, or riding in a car, and she could go out alone. (*Id.* at PageID.206). Although she did not often shop, because she did not like to, she did shop for groceries, gifts, and personal needs. (*Id.*). She remained able to pay bills, count change, handle a savings account, and use a checkbook or money orders; her husband paid all the bills. (*Id.*). Her ability to handle money had not changed since onset. (*Id.* at PageID.207).

She indicated that she had no problems with personal care, including dressing, bathing, caring for her hair, shaving, feeding herself, and using the toilet. (*Id.*). No special reminders were necessary for her to take care of her personal needs or grooming, though she did set an alarm to remember to take her medicine. (*Id.* at PageID.205). She now found herself sleeping "a lot longer" than she had before. (*Id.* at PageID.204).

On a daily basis, Plaintiff prepared a main dish and a soup or salad with her husband's help, spending about half an hour to one hour. (*Id.* at PageID.205). She would "constantly double check recipe I used to know by heart." (*Id.*).

For fun, Plaintiff enjoyed reading and gardening "maybe three times a week," with no changes since onset. (*Id.* at PageID.207). Almost every day, she took a walk with her husband, and she also enjoyed having lunch with others and participating in activities at

20

her church once or twice a week. (*Id.*). On a regular basis, she visited family and went to the movies, church, and plays. (*Id.*). She met family or friends at least once a week, and had no problems getting along with others. (*Id.* at PageID.207-09). She needed no reminder to go places. (*Id.* at PageID.207). But she did find that she stayed home "a lot more" than she used to. (*Id.* at PageID.208).

Next, Plaintiff indicated that her illnesses, injuries, or conditions affected her abilities to squat, bend, stand, follow instructions, and use her hands, as well as her memory and concentration. (*Id.*). She explained: "I have been diagnosed with a visual-spatial cognitive impairment from lupus that has developed over time along with visual motor skill dysfunction per rheumotide [sic] part of lupus." (*Id.*). According to Plaintiff's estimate, she could walk 3 miles before needing to stop and rest for 15 minutes. (*Id.*).

How long she could pay attention "depend[ed] on the activity," but she could finish what she started. (*Id.*). When following written instructions, she needed to keep "rechecking" them, and she did not follow spoken instructions very well. (*Id.*). Faced with a change in routine, Plaintiff sometimes forgot the steps she was supposed to take. (*Id.* at PageID.209). And Plaintiff tended to "internalize" stress, "which really sets off my lupus." (*Id.* at PageID.209).

Plaintiff took medications, but they did not cause any side effects. (*Id.* at PageID.210).

In closing, she said:

> I have always worked (17 years) loved my job and took pride in what I did.
> I was asked to resign for medical reasons, thus losing a good income and

good insurance. I am fearful of my future due to lack of income, insurance,
and the progression of my medical condition.

(*Id.*).

### ii.  Plaintiff's Testimony at the Hearing

An administrative hearing was held in Plaintiff's case on July 12, 2017. (R. 7 at

PageID.61). Plaintiff testified that after earning an associate's degree, she had worked for

15 years—until July 2015—as a surgical scrub technician in several medical facilities. (*Id.*

at PageID.72). Her responsibilities included setting up the room for the surgeon and the

patient, maintaining complete sterility, manually positioning patients, providing needed

supplies, and confirming patient information for the surgeon, the anesthesiologist, and the

charge nurse in the room. (*Id.* at PageID.72-73). Surgeries could last from 2 hours to 6

hours, and her shifts had been a minimum of 8 hours, but could run up to 14 hours. (*Id.*).

Plaintiff explained that her hips and her knees had "always" hurt, as had her back

after a long day of work. (*Id.* at PageID.74). She knew that she had had imaging of her

knees as part of her fitness evaluation at her last job, but said no one had discussed any

findings with her. (*Id.* at PageID.75).

Plaintiff was able to take care of herself "with help." (*Id.* at PageID.76). She "used

to be very active and do everything around" her house—working, taking care of her and

her husband's three children, gardening, and participating in parenting groups and her

children's extracurricular activities. (*Id.*). Now she was no longer active "[i]n organization

things." (*Id.*). Her husband did "90 percent" of the cooking because it was hard for her "to

remember how to put recipes together," and she had burned herself a few times because

her tremors made it difficult for her to "lift and stir and take things out of the oven." (*Id.* at PageID.77). Her husband also did "at least 90 percent" of the cleaning around the house, because she could not get down on her knees to scrub "little corners," would not climb a ladder due to balance problems, and could not lift heavy furniture or use the carpet shampooer. (*Id.*). In addition, her husband did most of the laundry because it required using the stairs, which her balance issues made difficult. (*Id.*). She was attending physical therapy to improve her balance at the time of the hearing. (*Id.*). Plaintiff did fold laundry, but "[i]t's not always the same way, the same time. It doesn't always fit into the drawers or the linen closets." (*Id.*).

A small grocery run "for eggs or milk" was within Plaintiff's ability, but going to Meijer or Wal-Mart gave her anxiety; her husband did the grocery shopping. (*Id.* at PageID.77-78).

Because of Plaintiff's tremors, she wore Velcro shoes, very little makeup, and the same necklace all the time, and no longer wore earrings. (*Id.* at PageID.78). Plaintiff had a tablet, which she used to "look at pictures for art." (*Id.*). Her daughter was her "tablet person" and helped her use it to shop online because she no longer liked shopping at the mall. (*Id.*). Although Plaintiff used the tablet for the same tasks repeatedly, her daughter left her written instructions to follow because she would forget what to do. (*Id.* at PageID.79). (*Id.*).

In closing, Plaintiff said, "Seriously, I have lost some of myself. I used to be very athletic. I used to be the mom that . . . when plan A didn't work, I always had a plan B. Just very active, and very—I was the woman that wanted to put the parties together and the

entertaining and the decorating and so . . . I'm kind of in mourning for my old self a little bit." (*Id.* at PageID.79-80). Still, she tried to be responsible for her health—she ate well, took walks, and did not smoke, drink, or use narcotics. (*Id.* at PageID.80).

### iii.   The Vocational Expert's Testimony at the Hearing

Vocational Expert (VE) Cheryl Yousef also testified. (*Id.* at PageID.81-87). She classified Plaintiff's past work as a Surgical Technician, skilled work, SVP 6, classified at the light exertional level and performed at heavy. (*Id.* at PageID.82). The ALJ then posed her first hypothetical: "[A]ssume an individual of Ms. Littlefield's age . . . has at least a high school education, and the past work that you just classified. Further assume that this hypothetical individual can perform work at all exertional levels, however, would be limited to simple and routine instructions and tasks." (*Id.*).

The VE testified that such a hypothetical person would not be able to perform Plaintiff's past work. (*Id.*). But jobs existed in significant numbers in the national economy that she could perform—for example, at the medium exertional level, hospital food service worker (unskilled work, SVP 2, with 100,000 jobs nationally); dining room attendant (unskilled, SVP 2, with 200,000 jobs nationally); and kitchen helper (SVP 2, with 210,000 jobs nationally). (*Id.* at PageID.82-83)

For the second hypothetical, the ALJ added a limitation to frequent handling and fingering bilaterally; the same jobs would remain available. (*Id.* at PageID.83). If the limitation on handling and fingering was to occasional, however, the listed jobs would be eliminated. (*Id.* at PageID.83-84).

Next, the ALJ asked the VE to assume a hypothetical person of Plaintiff's age, education and work experience who was limited to light work and simple and routine instructions and tasks. (*Id.* at PageID.84). Past work would be eliminated, and no skills would be transferrable. (*Id.*).

### F. Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into categories: "acceptable medical sources" and "other sources." 20 C.F.R. §§ 404.1513 (amended March 27, 2017), 416.913 (amended March 27, 2017).[3] "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* §§ 404.1513(a), 416.913(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* §§ 404.1513(d), 416.913(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both acceptable and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* When acceptable medical sources issue such opinions, the regulations deem the statements to be "medical opinions" subject

---

[3] SSR 06-03p was rescinded effective March 27, 2017, and 20 C.F.R. § 404.1513 was updated as of March 27, 2017. The new regulation is effective for cases filed on or after March 27, 2017; because Plaintiff filed for DIB in August 2015, I consider her case under the old rule.

to a multi-factor test that weighs their value. 20 C.F.R. §§ 404.1527 (eff. Sept. 3, 2013 to Mar. 26, 2017), 416.927 (eff. Aug. 24, 2012 to Mar. 26, 2017). Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* §§ 404.1527(d), 416.927(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. *Id.* §§ 404.1527(c) (eff. Sept. 3, 2013 to Mar. 26, 2017), 416.927(c) (eff. Aug. 24, 2012 to Mar. 26, 2017). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. §§ 404.1527(c), 416.927(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Because Plaintiff filed her claim before March 27, 2017, she is entitled to the benefit of the treating-source rule. Under that rule, certain opinions of a treating physician receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. §§ 404.1527(d), 416.927(c)(2).

26

Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d), 416.927(d).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to a treating source's opinion in the written determination. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits must give specific reasons, supported by record evidence, for the weight granted to a treating source's opinion. *Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

The claimant must provide evidence establishing his or her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2).

In accordance with SSR 16-3p, an ALJ must analyze the consistency of the claimant's statements with the other record evidence, considering his or her testimony about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in the Social Security Ruling. SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016).

27

This analysis and the conclusions drawn from it—formerly termed a credibility determination—can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529(a) (2016); 16-3p, 2016 WL 1119029, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529 (2016); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071) (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments will "not alone establish that [he or she is] disabled." 20 C.F.R. § 404.1529(a). The absence of objective, confirming evidence obligates the ALJ to consider the following factors:

(i)    [D]aily activities;
(ii)   The location, duration, frequency, and intensity of . . . pain;
(iii)  Precipitating and aggravating factors;
(iv)   The type, dosage, effectiveness, and side effects of any medication . . . . taken to alleviate . . . pain or other symptoms;

28

(v)     Treatment, other than medication, . . . received for relief of . . . pain;

(vi)    Any measure . . . used to relieve . . . pain.

20 C.F.R. § 404.1529(c)(3), 416.929(c)(3) (2016); *see also Felisky v. Bowen*, 35 F.3d 1027,

1039-40 (6th Cir. 1994); 16-3p, 2016 WL 1119029, at \*7.

**G. Analysis**

Plaintiff argues the ALJ's decision cannot stand because (1) substantial evidence

does not support the ALJ's finding that Plaintiff could do simple and routine tasks; and (2)

Plaintiff should have been limited to at most occasional handling and fingering. (R. 9).

### 1. Whether Substantial Evidence Supports the RFC Limiting Plaintiff to Simple and Routine Tasks

The ALJ determined that Plaintiff had the RFC "to perform a full range of work at

all exertional levels but with the non-exertional limitation of only simple and routine

instructions and tasks." (R. 7 at PageID.53).

Plaintiff avers that "a limitation to simple routine tasks is not enough, as Plaintiff

would not even be able to remember those." (R. 9 at PageID.450). Plaintiff attacks the RFC

from several angles, suggesting the ALJ erred by formulating an RFC inconsistent with the

evidence in the record, substituting her own judgment for that of multiple qualified medical

professionals, failing to specifically address some of Plaintiff's testimony, and failing to

address the opinion of Dr. Savanoor.[4] (*Id.*).

---

[4] Though Plaintiff never outright accuses the ALJ of erring by relying on the state agency medical consultants, she denigrates their opinions enough that I feel it prudent to mention that state agency reviewing consultants are a proper source for the ALJ to consider in forming her opinion. *See* SSR 96-6p, 1996 WL 374180, at \*1 (S.S.A. July 2, 1996) (eff. through March 26, 2017) (explaining that "[f]indings of fact made by State agency medical and psychological consultants . . . regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence of nonexamining sources" at the ALJ level). *See also Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 274 (6th Cir. 2015) ("Generally, an

To muster support for her argument, Plaintiff recounts mostly the testing by Endres and Wynkoop, and the notes penned by Plaintiff's coworkers when she was a surgical technician. (R. 9 at PageID.450-53). For example, she emphasizes that her visual-spatial memory is weaker than 86 percent of adults in her age range, and points to Endres's statement that "when visual spatial memory is weak, a person can be repeatedly faced with routine tasks without remembering how to do them," and would have trouble "quickly figuring out again how to complete the task." (R. 9 at PageID.451) (citing R. 7 at PageID.322, 336). And Wynkoop, she says, "was so concerned about Plaintiff's inability to sustain concentration on tasks that he told her she shouldn't be driving anymore." (R. 9 at PageID.450) (citing PageID.368) ("Today's test data, especially the degree of disruption to her ability to concentrate, suggests that she should not be driving. If she believes otherwise, then she should be referred for . . . evaluation to help determine and improve her safety on the road.").

But the court may not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. Here, the ALJ considered Plaintiff's activities of daily living, her presentation at the

---

ALJ is permitted to rely on [a] state agency physician's opinions to the same extent as she may rely on opinions from other sources."); *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009) ("Certainly, the ALJ's decision to accord greater weight to state agency physicians over [the claimant's] treating sources was not, by itself, reversible error.").

hearing, the conservative treatment she underwent, and limited objective findings in the record, giving great weight to consulting psychologist Oliver-Brannon and good weight to state agency medical consultant Greaves, among the opinions of other medical experts. (R. 7 at PageID.51-56).

Though Plaintiff accuses the ALJ of "play[ing] doctor" by offering her opinion on Plaintiff's memory and concentration based on Plaintiff's conduct at the hearing, (R. 9 at PageID.451-52), an ALJ may rely in part on her own personal observations. The Sixth Circuit in *Weaver* did find the ALJ erred in relying *solely* on his personal observations of a claimant's demeanor at the hearing to discount allegations of disabling pain—the so-called "sit-and-squirm" test. *Weaver v. Sec'y of Health & Human Servs.*, 722 F.3d 310, 312 (6th Cir. 1983). But the court simultaneously recognized that "observation and credibility" are "material, relevant, and admissible." *Id.* The ALJ simply "must cite *some* other evidence . . . in addition to personal observation." *Id.* (emphasis in original). Because the ALJ here did not rely solely on her own observations, I suggest it was not error for her to consider them as one factor in her analysis. *See Coleman v. Chater*, 86 F.3d 1155 (6th Cir. May 24, 1996) (table) (finding substantial evidence where the ALJ properly considered the plaintiff's attention and memory as exhibited at the hearing, in addition to other evidence); *Whitfield v. Bowen*, No. 86-7174, 822 F.2d 1014, at *2 (6th Cir. Nov. 9, 1987) (unpublished) ("[T]he ALJ properly considered Whitfield's appearance and behavior at the hearing, during which she was 'alert, attentive, responsive,' without displaying 'any impairment in terms of her memory or concentration.'").

Here, the ALJ also relied on the "conservative treatment and limited objective findings in the record," as well as the opinions of multiple medical professionals. (*Id.*). She gave great weight to Oliver-Brannon, who performed a psychological consultative examination in October 2015. Oliver-Brannon determined that Plaintiff was "able to understand and engage in some moderate daily living tasks," though "[c]omplex tasks may be difficult for her," and concluded that "if employment is considered some restrictions may be needed." (*Id.* at PageID.355). The ALJ recognized that Plaintiff had reported to Oliver-Brannon that she forgot how to do things and had decreased fine motor coordination and function, but also reported that on a regular basis she cared for her hygiene, dressed, attended church, spent time with family, and helped with household chores. (R. 7 at PageID.55) (citing *id.* at PageID.353) Oliver-Brannon observed that Plaintiff had intact judgment and insight, logical speech, full orientation, normal memory, and the ability to perform some simple calculations. (*Id.* at PageID.354).

In addition, the ALJ gave "good weight" to state agency medical consultant Greaves, who opined that Plaintiff could succeed at simple, repetitive work activities. (R. 7 at PageID.96). The ALJ also explained she had accounted for Plaintiff's limitations as outlined by Wynkoop—variable attention, mild reactive dysphoria, problematic organization and planning, and concept formation—by restricting her to only simple and routine instructions and tasks. (R. 7 at PageID.55).

Next, I turn to Plaintiff's contention that the ALJ erred by omitting certain facts about her activities of daily living. Plaintiff faults the ALJ for addressing only some of Plaintiff's testimony about her activities of daily living, and not including that she struggled

32

to follow recipes, had to follow written instructions to remember how to use her tablet, and became anxious when shopping at big stores like Meijer or Walmart, and that her husband did most of the grocery shopping. (R. 9 at PageID.452). But the ALJ is not required to specifically discuss every piece of evidence in the record to demonstrate that it was considered. *See Kornecky v. Comm'r of Soc. Sec.,* 167 F. App'x. 496, 507-08 (6th Cir. 2006) ("[I]t is well settled that[ ] 'an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'"); *Loral Defense Sys.-Akron v. N.L.R.B,* 200 F.3d 436, 453 (6th Cir. 1999) ("[T]hat the ALJ's opinion failed to discuss all of the testimony and evidence presented to him does not mean that the ALJ 'failed to consider' the evidence."); *Daniels v. Comm'r of Soc. Sec.,* 152 F. App'x 485, 489 (6th Cir. 2005) ("[A]lthough required to develop the record fully and fairly, an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered.") (quoting *Simons v. Barnhart,* 114 F. App'x 727, 733 (6th Cir. 2004)).

To the extent Plaintiff sought to challenge the ALJ's decision not to wholly credit her subjective reports based on part on her activities of daily living, I suggest Plaintiff has not presented enough reason for the court to disturb the ALJ's decision. In the first place, it is not entirely clear that Plaintiff intended to challenge the ALJ's findings about her credibility. The ALJ found that the alleged severity of Plaintiff's symptoms and limitations was inconsistent with her activities of daily living, her presentation at the hearing, the conservative treatment she underwent, and the limited objective findings in the record. (R. 7 at PageID.54-55). Further, the ALJ noted that at the hearing, Plaintiff "responded

appropriately and with adequate memory and concentration." (*Id.*). Plaintiff's only reference to this finding was two sentences complaining that "[w]hile the ALJ . . . addressed some aspects of Plaintiff's activities of daily living"—including that she made small shopping trips, had no problems with personal care, made meals, cleaned, did laundry, gardened almost daily, drove, went to church weekly, spent time with others, and went to the movies—she did not explicitly address Plaintiff's testimony that she struggled to follow recipes and use her tablet, and that shopping at large grocery stores gave her anxiety. (R. 9 at PageID.452).

Defendant did not understand Plaintiff to be challenging the ALJ's "partial discounting of her subjective statements," (R. 11 at PageID.467); Plaintiff responded that Defendant's reading "makes little sense as Plaintiff clearly disputed the ALJ's assessment of her activities of daily living," (R. 12 at PageID.483). It is not clear to this reader that those are synonymous. But even assuming Plaintiff did intend to challenge her credibility analysis, I suggest she has not presented a reason sufficiently compelling to overcome the ALJ's multiple reasons for partially discrediting her. She does not, for example, contest that she can make small grocery trips; she simply argues that the ALJ should have considered that she does not make *large* grocery shopping trips. And she does not engage at all with the multiple other reasons the ALJ presented. An ALJ's credibility determination is entitled to "great weight and deference," *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003), and I suggest that the ALJ's failure to explicitly discuss some of the specifics of Plaintiff's activities of daily living is insufficient reason to disturb the ALJ's determination here.

Lastly, Plaintiff protests that the ALJ "never even addressed the opinion of Dr. Savanoor." (R. 9 at PageID.450); *also* (*id.* at PageID.453) ("The ALJ . . . didn't even address the opinion of Dr. Savanoor."). She does not explicitly call this error or explain why it would be error, let alone address whether it was harmful. The only part of Dr. Savanoor's letter to which she refers in her argument, (R. 9 at PageID.451), is a single sentence that is part of Dr. Savanoor's summary of Endres's findings, *compare* (R. 7 at PageID.316) ("When faced with a weakness in visual-spatial memory a person can be repeatedly faced with routine tasks without remembering how to do them; when combined with a weakness in visual-spatial reasoning, a person has even greater difficulty in figuring out how to complete a task.") *with* (*id.* at PageID.252) ("When visual-spatial memory is weak, a person can be repeatedly faced with routine tasks without remembering how to do them. Then when visual-spatial reasoning is also poor, the person would have trouble quickly figuring out again how to complete the task."). Notably, the ALJ *did* explicitly consider Endres's opinion. (*id.* at PageID.54). Not until Plaintiff's response does she outright allege that it was error for the ALJ not to address Dr. Savanoor's letter. (R. 12 at PageID.482-83).

Meanwhile, Defendant asserts that the ALJ was not required to specifically address Dr. Savanoor's letter because Dr. Savanoor offered no "medical opinion" for the purposes of Social Security—she did not address "the specific extent of [plaintiff's] limitations," including what plaintiff "can still do despite impairment(s)." (R. 11 at PageID.469-70).

Plaintiff responds that Dr. Savanoor *did* offer a medical opinion, because "Dr. Savanoor began her assessment of the medical records by saying 'in my medical opinion.'"

(R. 12 at PageID.483).[5] She contends it is irrelevant whether Dr. Savanoor was "reviewing evidence generated by other people," and draws a parallel to non-examining state agency consultant Dr. Greaves. (*Id.*). Then she says, "This is hardly harmless error"—she does not explain why.

In my view, Plaintiff has not meaningfully challenged the ALJ's treatment—or lack thereof—of Dr. Savanoor's letter. The phrase "my medical opinion" has no magical properties. What constitutes a medical opinion for our purposes is defined in the regulations: "Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1).[6] Plaintiff does not engage with this definition or explain how she was harmed by the ALJ's omission of any discussion of Dr. Savanoor's letter.

Further, an examination of Dr. Savanoor's letter reveals that most of it is not a "judgment" by Dr. Savanoor, but merely a summary of Endres's findings. (R. 7 at PageID.316-17). A few sentences, however, do appear to comprise Dr. Savanoor's own judgments; all of them express safety concerns about Plaintiff continuing to perform her

---

[5] Plaintiff also had several other encounters with Dr. Savanoor as her fitness for duty was evaluated, but Plaintiff does not address those encounters, even as remotely as she did Dr. Savanoor's letter.

[6] This regulation applies to claims filed before March 27, 2017, as Plaintiff's was. Although a different version of this regulation was in effect at the time Plaintiff filed for Social Security, this definition has not materially changed. *See* 20 C.F.R. § 404.1527(a)(2) (eff. Aug. 24, 2012 to Mar. 26, 2017) ("Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.").

job duties as a surgical technician. For example, Dr. Savanoor says that Endres's "findings pose a major patient care and work place safety issue. My recommendation in view of patient safety is for Debbie Littlefield to be removed from patient care duties or any other safety sensitive issues." (*Id.* at PageID.317); *also* (*id.* at PageID.316) ("In my medical opinion . . . there are significant safety concerns in regards to performing essential job duties."). These could be considered statements that reflect judgments about Plaintiff's restrictions due to her impairments, and thus medical opinions.

Even so, Dr. Savanoor's opinion is precisely in line with Endres's, (R. 7 at PageID.258) ("Ms. Littlefield is not fit for duty in her current position. . . . Ms. Littlefield poses a patient safety risk . . . ."), just as it is in line with the ALJ's own finding that Plaintiff was unable to perform her past relevant work as a surgical technician, (*id.* at PageID.56). Thus, I suggest any error was harmless. *See Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001) (finding harmless error where ALJ did not mention treating physician's opinion, in part because the ALJ crafted an RFC consistent with the physician's proposed limitations).

In sum, I suggest the ALJ's decision was supported by the substantial evidence outlined above, and should not be disturbed.

### 2. Whether Substantial Evidence Supports the RFC Despite Its Lack of Limitations on Plaintiff's Handling and Fingering

Plaintiff next suggests that the ALJ erred by failing to restrict Plaintiff to no more than occasional handling and fingering, considering (1) Endres's testing showing Plaintiff has the visual-motor integration skills of a 7-year-old, (2) the consultative examiner's note

that Plaintiff was not capable of writing repetitively, and (3) parts of Plaintiff's testimony, such as that due to her tremors she wore "very little" makeup, never changed her necklace, did not wear earrings, and wore Velcro shoes. (R. 9 at PageID.453-54).

Defendant points out that the ALJ found Plaintiff's physical impairments non-severe, giving great weight to the opinion of state agency medical consultant Dr. Shahida Mohiuddin that Plaintiff had no severe physical impairments. (R. 7 at PageID.92-93). Further, the ALJ noted that at a 2015 internal medicine consultative examination with Dr. Lazzara, Plaintiff had normal grip and dexterity, a full range of motion in all joints, and 5/5 motor strength throughout. (*Id.* at PageID.51) (referring to *id.* at PageID.348-51). Most importantly, Dr. Lazzara reported that "while the claimant complained of difficulty with manipulative tasks, she was able to do manipulative tasks during the examination." (*Id.*) According to Dr. Lazzara's notes, Plaintiff was able to button her clothes, tie her shoes, dress and undress, dial a telephone, open a door, make a fist, pick up a coin or pencil, and write. (*Id.* at PageID.344).

Instead, Plaintiff attempts to undermine the ALJ's analysis by pointing out that the consultative examiner observed "that she was not capable of writing repetitively." (R. 9 at PageID.453). Dr. Lazzara did add an illegible handwritten word in the comments section next to the notation that "yes," Plaintiff could write; I cannot make out what that word is with any degree of confidence. Plaintiff does not hazard a guess. Defendant surmises it may be "briefly," despite its missing letters. (R. 11 at PageID.474 n.6).  In any event, that coda apparently did not bear mention in Dr. Lazzara's typewritten notes, in which he stated that Plaintiff's gross motor function appeared stable and she was "able to do manipulative

38

tasks today." (R. 7 at PageID.351). Whatever the note may say, it is ambiguous enough that I do not see how it can undermine the evidence on which the ALJ's analysis rests.

Further, Plaintiff does not explain how Endres's estimate that Plaintiff had the visual-motor integration skills of a seven-year-old necessitates a limitation to only occasional handling and fingering. Does the average seven-year-old have such a limitation? Is that limitation the result of his or her visual-motor integration skills? Neither Endres nor any other medical source in the record interprets this data point in terms of an RFC restriction.

Lastly, Plaintiff points to her testimony about her tremors; as I explained above, I see no reason to disturb the ALJ's decision to only partially credit her statements about the intensity, persistence, and limiting effects of her symptoms.

For the above reasons, I suggest substantial evidence supports the ALJ's decision not to include any manipulative restrictions in Plaintiff's RFC. If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could reasonably support another conclusion, the decision of the [ALJ] must stand if the evidence could reasonably support the conclusion reached."). To the extent Plaintiff asks the court to reweigh the evidence or resolve conflicts in her favor rather than as the ALJ decided them, I must decline. *Albanna v. Comm'r of Soc. Sec.*, No 15-14264, 2016 WL 7238925, at *1, *12 (E.D. Mich. Nov. 22, 2016) ("Arguments which in actuality

require 'reweigh[ing] record evidence' beseech district courts to perform a forbidden ritual.") (quoting *DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014)).

Thus, I suggest the Commissioner's decision is supported by substantial evidence and should be affirmed.

### H. Conclusion

For the reasons stated above, I suggest that substantial evidence supports the Commissioner's decision, and I therefore **RECOMMEND** that Plaintiff's Motion for Summary Judgment, (R. 14), be **DENIED**, the Commissioner's Motion for Summary Judgment, (R. 16), be **GRANTED**, and this case be **AFFIRMED.**

## III. <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370,

1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  July 3, 2019                         S/ PATRICIA T. MORRIS
                                            Patricia T. Morris
                                            United States Magistrate Judge


**CERTIFICATION**

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: July 3, 2019                          By s/Kristen Castaneda
                                            Case Manager